SEPT. TERM,
1842.

STEPHENSON v. SMITH.

Stephenson
v.
Smith.

1. In chancery. An application was made to enter lands with the United States' Register and Receiver. The clerk in the offices, who was acting both for the Register and Receiver, delivered to the applicant an informal and void certificate of entry, and made out a formal certificate in the name of another, which he retained in his possession. On this certificate an assignment, with a blank for the name of the assignee, was executed in the name of the person mentioned in the certificate of entry. The clerk in the offices sold the land described in the certificate to one S., and inserted his name in the blank in the assignment on the certificate. S. afterwards procured a patent for the land from the United States. Held, that under the circumstances S. was not a bona fide purchaser : that the title he procured from the United States enured to the benefit of the applicant to enter the land, who paid the purchase money.

2. Although the validity of a patent cannot be questioned in a collateral proceeding, yet, if one enters lands of the United States with the money of another, in his own name, and procures a patent for the same from the general government, a court of equity will decree the title to him to whom the money belonged. Such a proceeding does not invalidate the patent, but recognizes its validity.

3. The State courts have jurisdiction of causes instituted for such purposes, and a decree compelling the fraudulent patentee to convey to the equitable owner, does not violate the compact between this State and the United States, by which the State binds herself to abstain from passing any law interfering with the primary disposal of the soil by the United States; and with any regulation Congress may find necessary for securing the title in such soil to the bona fide purchaser.

(Tompkins, Judge, dissenting.)

Error to the St. Charles Circuit Court.

CAMPBELL AND GAMBLE for Plaintiff.

BATES for Defendant.

*Opinion of the Court, delivered by Scott, Judge.*

This was a bill in chancery, filed by Nancy Smith against Thomas Stephenson and James Coleman for an injunction and relief. The bill stated that the plaintiff, Nancy Smith, in the year 1829, at the United States land office, in St. Louis, entered a large quarter section of land, situated in the county of St. Charles. She was, at the time of the entry, and ever since has been, in pos-

session of the said tract of land. At the time of making the entry, James Coleman, one of the defendants, was acting as agent or clerk both for the register and receiver. It being inconvenient to go in person, she sent her son to the office, who paid to Coleman the purchase money, for and in the name of his mother. Instead of a regular certificate of entry, Coleman fraudulently delivered to her son, who was so illiterate as to be unable to read writing, a paper of which the following is a copy.

<div style="margin-left:auto">SEPT. TERM, 1842.

Stephenson
v.
Smith.</div>

RECEIVER'S OFFICE, *St. Louis, Mo.*
October 6, 1829.

No. 1891. Received from Samuel Johnson, of ———— county, Ky., the sum of one hundred dollars, ———— cents, being in full for the west ½, S. E. ¼ of section No. 17, of township No. 47, range No. 2, E., containing 80 acres, at the rate of $1.25 per acre. $100.

<div style="margin-left:auto">JAMES COLEMAN,
*For the Receiver.*</div>

And with his own hand wrote upon the back of the receipt a memorandum, of which the following is a copy :

"The patent for the within W. ½, S. E. ¼, sec. No. 17, 47, 2 east, containing 80 acres, will issue in the name of Nancy Smith, of St. Charles county, Mo.

<div style="margin-left:auto">JAMES COLEMAN,
*Land Office,* 5th *Dec.* 1829.</div>

Her son received the paper, not suspecting any fraud, and returning home delivered it to her. She being unable to read, did not doubt but that the receipt was regular, and that in due time she would receive a patent for the land which she had thus purchased. The bill then charges that there was no such person as Samuel Johnson, named in the receipt; that it was a mere name assumed by Coleman to effect his fraudulent purpose. In pursuance of that purpose he made out a regular certificate of entry in the name of Samuel Johnson, bearing the same date with the receipt above mentioned, which was

*SEPT. TERM.*
*1842.*

Stephenson
v.
Smith.

signed by the proper officer. (It appearing to be the practice of the ___ for the receiver to sign blank receipts ___, and leave them with his clerks.) On ___ entry, the said Coleman wrote an assignment ___, with a blank for the name of the assignee, ___ purported to be executed by Samuel John ___ being a notary public, also wrote an ___ the assignment, which was duly authen ___

Co ___ left the State of Missouri, and went ___ en he sold the land in controversy to T ___ one of the defendants, and delivered ___ ficate of entry, first inserting his name ___ blank in the assignment. Ste- phen ___ October, 1834, obtained a patent for ___ own name, as assignee of Samuel Johnson, ___ ed an action of ejectment against ___ prays for an injunction, and that ___ be decreed to pass to the plain- ___ may be delivered up, &c. The answer of Co ___ denies all knowledge of the fraud- ulent ___ or of any of the transactions with ___ chase. Denies that Nancy Smith entered ___ dispute, or that she has any title ___ le. He purchased the land under the ___ fences. Many years ago he was acquainted ___ in Kentucky, where they both resided ___ becoming insolvent, went to St. Lou ___ debts unpaid in Kentucky. In the year ___ ed to Kentucky, where he again met ___ desirous to make arrangements to ___ Coleman informed him that he had ___ tracts of land in that State, and was ___ as much as would make a good farm ___ representations, he agreed to purchase ___ dispute, together with another tract of ___ sum of one thousand dollars. At the t ___ purchase he was informed by Coleman that the title was not in himself, but in the name of S.

Johnson, a friend of his, who resided in Kentucky or Missouri; that he held the certificate of entry, the usual paper given to those who enter the public lands, as evidence of the fact, and that for the convenience of conveyance, the said Samuel Johnson had regularly executed and acknowledged a blank assignment of said certificate; that the blank was left for the name of the purchaser, and that he, Coleman, was fully empowered to fill the same. It was agreed between him and Coleman, that the purchase money should not be paid till it was ascertained whether a patent would issue in his, Stephenson's, name. Coleman filled up the blank in the assignment, and delivered it to him. He believed the certificate of entry had been assigned in that manner by Coleman in order to prevent being harrassed by his old debts in Kentucky. He believed the land had been fairly entered by Samuel Johnson, and that Coleman was fully authorized to dispose of it. To be entirely guarded against the possibility of any fraud, or mistake, or defect of title, or authority, he determined to make inquiry as to the title at Washington City; and after fully stating all the circumstances under which he became possessed of the certificate of entry, to the Commissioner of the General Land Office, he was informed by that officer that a patent would issue in his name, as assignee of Samuel Johnson. In October, 1834, he received a patent for the land in controversy, having previously paid Coleman the purchase money, and afterwards commenced his action of ejectment. He denies all knowledge whatever of the title of the plaintiff. Coleman never answered the bill, and it was taken for confessed as to him, after proof of service by publication.

On the hearing of the cause, the original receipt given by Coleman to Nancy Smith, and the original certificate of entry in the name of S. Johnson, and the assignment thereon were produced. Two witnesses were introduced, who being well acquainted with Coleman's hand writing, from having seen him frequently write, were confident that the said papers were in the hand writing of Coleman. That the sig-

nature purporting to be Coleman was his; and although the signature Samuel Johnson, subscribed to the assignment on the certificate was simulated, yet from points of resemblance between it and the genuine hand writing of Coleman, they believed it to be his: that Coleman did business in the land offices for both the register and receiver. Those officers were in the habit of signing, in blank, the necessary papers which were filled up by Coleman, and delivered to the purchaser of the public lands: that Coleman was discharged by the land officers on account of imputations of fraud against him on the account of the officers. The witnesses did not recollect whether Coleman was in the office or not in the year 1829.

Another witness was produced, the son of the plaintiff; he testified that his mother, some short time before she entered the land, became apprehensive that another would enter it: she had not the money and could not obtain it. It seems then a brother of the plaintiff went to St. Louis and made some arrangement by which her apprehensions were quieted. The witness further testified, that some few weeks after, at the instance of his mother, he went to St, Louis to enter the land. He was informed by his mother's brother, who had previously been to St. Louis on that business, that he would have some interest to pay on the money; and that if he paid the money and interest he would get the certificate. He paid Coleman one hundred and ten dollars for the land and interest. Coleman took the receipt, a copy of which has been set out above, and wrote the memorandum thereon. That he was unable to read writing, as was likewise his mother; and it was some years after that they were apprised of the fraud committed by Coleman, and of the claim of another to the land.

On the hearing the court decreed for the plaintiff, from which an appeal has been taken to this court.

The first point made by Stephenson's counsel is, that Nancy Smith does not show any title or claim, legal or equitable, such as wi'l enable her to contest the right of Stephenson; or, in other words, there is no evidence that she ever entered the land in dispute. This objection will make

it necessary to offer some observations on the estimony

preserved in the cause. Nancy Smith being fearful another would enter the land, prevailed on her brother going to St. Louis to do something by which it might be prevented. On the return of her brother her fears were quieted; and her son was informed by her brother that he would have something to pay for the money, and when the purchase money and interest were paid he would get the certificate : that he paid the purchase money, and ten dollars for interest a few weeks afterwards. The inference drawn from these facts is, that Coleman loaned the money when Mrs. Smith's brother went to St. Louis, and that the entry was made at that time ; and in order to secure himself, Coleman made out the certificate of entry in the name of Samuel Johnson, which was to be assigned upon the payment of the loan and interest. Mrs. Smith's son says, Coleman took the receipt from him and endorsed the memorandum: the receipt and certificate of entry bear the same date ; the memorandum bears date some weeks after the receipt. These circumstances strengthen the inference deduced from the facts above stated. Coleman might or might not have contemplated a fraud when the loan was made: he certainly placed it in his power to perpetrate one, had he been so minded. Then the receipt and the certificate of entry bear the same date, and on the receipt is the acknowledgment of Coleman, that Mrs. Smith will be entitled to the patent for the land. Does not those circumstances show all to be one transaction, and that the money of Mrs. Smith entered the land. When we take in consideration the testimony of the two witnesses well acquainted with the hand writing of Coleman, who believe that the signature of Samuel Johnson is the act of Coleman ; the admission contained in the answer of Stephenson, that he was informed that Johnson resided in Kentucky or Missouri, as if it was unknown in which of these States he lived ; the blank, in the receipt delivered to Mrs. Smith, for the name of the county in which he resided in the State of Kentucky, as if a friend should probably be ignorant of the county in which his friend lived with whom he corresponded ; the fact that the certificate of

SEPT. TERM, 1842.

Stephenson
v.
Smith.

An application was made to enter lands with the United States' Register and Receiver. The Clerk in the offices, who was acting both for the Register and Receiver, delivered to the applicant an informal and void certificate of entry, and made out a formal certificate in the name of another, which he retained in his possession. On this certificate an assignment with a blank for the name of the assignee was executed, in the name of the person mentioned in the certificate of entry. The clerk in the offices sold the land described in the certificate to one S. and inserted his name in the blank in the assignment on the certificate. S. afterwards procured a patent for the land from the United States. Held: that under the cir-

entry was never delivered to him, and that such a person has never been heard of since claiming any right to the land, we must adopt the conclusion of the plaintiff, that Samuel Johnson is a more name assumed by Coleman.

The purchase money then, having been paid by the plaintiff, a trust to the land resulted to her, although the entry was made in the name of another, whether that person was real or fictitious. No principle of equity law is better established, than that if a party purchase land in his own name with the money of another, a trust will result to the owner of the money, and he will be regarded in equity as the real owner, although the legal title may abide with the purchaser; Pot. A. or, (2 J. C. R. 409;) Stene v. Stene, (5, J. C. Ch.) Blan que, 116.

If then there was a resulting trust to the plaintiff; if she is in equity regarded as the real owner of the land, did Stephenson acquire it under such circumstances, as will induce a court of equity to refuse its aid against him? or, in other words, was he a bona fide purchaser for a valuable consideration without notice? Stephenson in his answer says, he believed he was really purchasing from Johnson. He acquired no title from Johnson, admitting he was the real owner; his authority would not have warranted Coleman in using his name as assignee. The act was void, and conferred no title whatever on Stephenson.

The certificate with a blank for the name of the assignee, was a nullity; it acquired no validity until it was filled up, and that must have been done by Johnson himself, or some person, as it was a sealed instrument, and can only be empowered by authority under seal; Paley on Agency. But if Johnson is to be regarded as a fictitious person, and Stephenson as the vendee of Coleman, how can he stand before the court under such circumstances, and ask it to strip him of the character of an innocent purchaser, for a valuable consideration without notice? Stephenson admits, that he believed the circuitous mode adopted by Coleman to transfer the land, was prompted by a desire to shield the land from his creditors. The principle is well established,

SEPT. TERM, 1842.

Stephenson
v
Smith.

that whatever puts a party upon inquiry is good notice in equity. Green v. Slayter, 4 J. C. R. 43; Sleny v. Arden, 1 J. C. R. 267. Another head of presumptive notice is, where the law imputes to a purchaser the knowledge of a fact of which the exercise of common prudence and ordinary diligence must have apprised him. Newland's Equity, 511. Was not the fact of a blank having been left in the assignment for the name of the assignee sufficient to excite his suspicions? But he says he believed that mode of transfer was employed by Coleman to protect the land from his creditors. Where, then, is his good faith in aiding Coleman to give effect to a device to defraud his creditors; and if he be believed, that Coleman was defrauding his creditors, and it turns out that some other party than a creditor was the victim of his contrivance, would a court of equity hear him urging such a defence? Common experience must have informed him that men whose purposes are honest and fair, do not usually adopt so sinuous a course; and no man who purchases from another under such circumstances can be said to act with good faith. The land was described in the certificate. By suitable inquiry, he could easily have ascertained whether or not it was claimed by another. He would have learned another was living upon it. None of these precautions were taken.

*cumstances S. was not a bona fide purchaser: that the title he procured from the United States enured to the benefit of the applicant to enter the land, who paid the purchase money.*

That part of the answer which speaks of the consideration paid for the land, is well calculated to excite mistrust as to its truth. In the body of the answer he avers he gave one thousand dollars for the land in dispute, and another tract of eighty acres. In the answer to the interrogatory, What was paid for the land? there is a blank for the consideration. He does not tell us what kind of land the other tract of eighty acres was, whether it was improved or unimproved we are left to conjecture; and he never saw the eighty in dispute, until after the purchase was made. Is it not strange he should give one thousand dollars for two tracts of eighty acres each, of which he knew nothing. When the certificate of entry informed him that one of the tracts, a

SEPT. TERM, 1842.

Stephenson v. Smith.

few years before had been purchased for one hundred dollars. But he has never shown what he gave for the tract of land in controversy. He gave a thousand dollars for that tract and another. The other tract may have been worth the money, and this may have been had for nothing. Certainly courts of equity do not presume that a party is a purchaser for a valuable consideration without notice; he must show it, although it is not charged against him. Frost v. Buckman, J. C. R., 302.

*Although the validity of a patent cannot be questioned in a collateral proceeding, yet if one enters lands of the United States with the money of another, in his own name, and procures a patent for the same from the general government, a court of equity will decree the title to him to whom the money belonged. Such a proceeding does not invalidate the patent, but recognizes its validity.*

The next point is, that the patent issued by the government of the United States for the land in dispute, cannot be cancelled or set aside in this mode; but it must be by scire facias, or bill in equity, in the name of the United States.

This objection cannot find a ground for its existence in the record. The bill does not seek to avoid the patent, nor is the decree of the court below that it shall be avoided or cancelled, It may be conceded that a patent cannot be avoided in a collateral proceeding; nor, unless it is absolutely void, can a party in any action or proceeding in which the patent may be used for evidence, or any other purpose, avail himself of any fraud, mistake, or circumstance by which it may be rendered void in a suitable mode of proceedure. It can only be avoided at the instance of the government issuing it, by a direct proceeding for that purpose ; a scire facias or bill in equity in the name of the authority from whom it emanated.

This is not an attempt to cancel a patent  The party who really paid the government for the land, and who is in equity entitled to it, asks that the legal title may be taken from him who has inequitably acquired it, and bestow it on the real owner. Nothing is more. frequently done by courts of equity than to take the legal title from one who has improperly obtained it, and annex it to the equitable title of another. If a party should entrust an agent with money to purchase a tract of our saline lands, or a sixteenth section, and he should make the purchase, and take a patent in his own name, would our courts of equity hesitate to strip him of the legal title, although acquired by patent, and

invest it in the individual advancing the money? 5 Ran-
dolph, 479, Norvell v. Caurm; 6 Morn., French v. Loyal
Company; Leigh, Taylor, and Quarles v. Brown, 5 Cranch,
243; Bodley v. Taylor, 5 Cranch, 191

If this is the principle by which our courts would be governed in relation to a patent under our own laws, we must inquire if there is any thing in the constitution or laws of the United States, which should prevent its application by the State courts to patents emanating from the general government.

The judicial power of the United States, extends to all cases in law and equity, arising under the constitution, the laws of the United States, and treaties made, or which shall be made under their authority. Congress has not as yet conferred on the Federal courts as extensive a jurisdiction as was contemplated by the constitution of the United States. The circuit courts of that government have original cognizance, concurrent with the courts of the several States, of all suits of a civil nature at common law or in equity, when the matter in dispute exceeds, exclusive of costs, the sum or value of five hundred dollars, and the United States are plaintiffs or petitioners, or an alien is a party, or the suit is between a citizen of the State where the suit is brought, and a citizen of another State. This is a case of which the Federal courts have not original cognizance, although arising under the laws of the United States. The general government has not yet deemed it expedient to vest their courts with original cognizance of such causes: it is content to entrust their determination to the State tribunals, satisfied with the control of such causes as is conferred by the 25th section of the judiciary act, which gives a writ of error from the supreme court of the United States to the final judgment or decree in any suit, in the highest court of law or equity of a State, in which a decision in the suit can be had, when, amongst other enumerated causes, is drawn in question a title set up, or claimed under the constitution, treaties, or laws of the United States. The cognizance of this cause, then, belongs to the State courts, and they will determine it according to

those principles of law and equity which prevail equally in the Federal and State courts. Our tribunals do not profess to be governed by any other rules and maxims, in the exercise of this jurisdiction, than those which would *control the* Federal courts, had they cognizance of the cause. Quoad this case our courts may be regarded as part of the judiciary of the Federal government. If our tribunals of justice, then, would not hesitate to decree a fraudulent patentee under our laws to convey his legal title to the equitable owner, and as in the cases above cited, we have seen the courts of the United States apply the principle to patentees under the State laws, what is there in the nature of a patent emanating from the general government, which should exempt it from this equitable control? We confess we can see nothing. We have seen that the Federal courts do not possess cognizance of such causes: we know the quantity of land yet to be entered in this State, and we know the numberless instances in which the purchaser is compelled to rely on agents to enter land for him. Shall our courts proclaim to all such agents that they may violate their trusts, enter the land in their own names, and bid defiance to their defrauded employers? Shall we give a premium to breaches of trust, and break down that salutary control by which courts of equity discourage fraud, in taking away all temptations to commit it? Shall it be said that an action on the case for money had and received, is the only remedy for such breaches of faith? and shall the dishonest grow rich with the wages of his iniquity, while our courts sit still, disarmed of the power of affording redress, by some mysterious reverence for a patent emanating from the general government? It is objected, that the act of congress authorizing the people of Missouri territory to form a constitution and State government, provides that the legislature of the said State should never interfere with the primary disposal of the soil by the United States, nor with any regulation congress may find necessary for securing the title in such soil to the bona fide purchaser; and that the State having expressed her assent to the said condition, by the tenth article of the State constitution, it would be a violation of the compact between the general government and this State, *if* her courts should

interfere and take away the title from him to whom it has been granted and vest it in another.

It has been shown that this is a case arising under the laws of the United States; and that Congress have not vested in these courts, original cognizance of this controversy. The title to the land has passed from the general government, and we are to determine to whom it should pass according to the laws of the U. States. In forming our judgment we are not influenced by any State law, but by the laws of Congress, and those principles of jurisprudence which would control the federal courts, had they cognizance of the suit. Was it intended that all wrongs committed under the laws of the general government for the disposal of the public lands should go unredressed? Can it be supposed that the general government ever intended, that the ministerial officers entrusted with the sale of the public lands, should disregard all legal restraints, and dispose of the lands as they pleased without regard to individual rights secured under the laws; and that those acts should be protected from all judicial control? Here are two citizens of the State of Missouri; she owes them protection; one complains that the other has done him an injury; the court inform him, that the injury arises under the laws of the United States: we cannot therefore interfere. The Federal courts have no power to afford redress: they are then without remedy. Is this to be tolerated in a government of laws?

The compact provides that the general assembly of the State, shall never interfere with the primary disposition of the soil, when the State courts assume jurisdiction of such controversies. It will not be pretended, that that will constitute an interference by the legislative department of our government. If that department should pass laws interfering with the disposal of the soil, and the State courts should enforce those laws, then a violation of the compact would be produced. Our courts in exercising the jurisdiction, are not influenced by State laws or regulations hostile to those of the general government. The State has passed no law on the subject; she has merely given her courts jurisdiction of all controversies arising between her own citi-

*Margin notes:*

SEPT. TERM, 1842.

Stephenson v. Smith.

The State courts have jurisdiction of causes instituted for such purposes, and a decree compelling the fraudulent patentee to convey to the equitable owner, does not violate the compact between this State and the United States, by which the State binds herself to abstain from passing any law interfering with the primary disposal of the soil by the United States; and with any regulation Congress may find necessary for securing the title in such soil to the bona fide purchaser.

52

SEPT. TERM, 1842.

Stephenson v. Smith.

zens; a controversy grown out of the laws of the United States, between those citizens and the United States, instead of providing tribunals to determine them, leave their adjustment to State courts, with a right of revision in the Supreme Court of the United States.

How can an assumption of this jurisdiction be deemed a violation of the compact, when in determining the controversies, whose cognizance we have assumed, we do not look to State laws or regulations for our guide, but to the laws of the United State, and to those principles of jurisprudence which would control the courts of the United States had they jurisdiction? We are in fact discharging a portion of the functions appertaining to the general government. Instead of acting in hostility to its policy and laws, we are humbly endeavoring to carry them into effect, in the spirit in which they are ordained. We connot see any ground for the imputation that in affirming the judgment of the court below we violate our compact with the general government. Could we conceive that such a consequence would be the result of our decree, none would be more ready to abstain from it. We trust Missouri will always wear bright the chain which binds her to her sister States, and seek respect for her own rights in a scrupulous observance of the rights of others. The decree of the court below is affirmed.

### Opinion of Tompkins, Judge.

Nancy Smith filed her bill in the circuit court of St Charles county against Thomas Stephenson, praying an injunction to stay proceedings in an action of ejectment in that court pending. She obtained a decree, to reverse which this appeal is prosecuted.

The case being of some importance in itself, as it affects the parties, and of infinitely greater importance, as it may, in its consequences, affect the interests of the community. I shall give at large the reasons which have induced me to dissent from the opinion of a majority of this court, affirming the judgment of a circuit court, over which presides one of the most enlightened and most worthy men in the State.

To this end it becomes necessary to make a full statement of the case, and particularly that the bill should be set out almost entire, and according to the letter.

It is as follows:—Nancy Smith of the county of St. Charles, widow, humbly complaining, most respectfully shows, that on or about the 6th day of October, 1829, she entered and purchased, with her own money, of the public lands of the United States, at the United States land office at St. Louis, the west half of the S. E. quarter of section No. 17, of township No. 47 north, in range No. 2 east, containing eighty acres, at the rate of one dollar and twenty-five cents per acre : that she took possession of the said lot of land, and has ever since lived upon and cultivated the same, it being in the county of St. Charles. It is her only home, and except a small quantity of personal goods, her only property. For several years after the making the entry and purchase aforesaid, not doubting of the goodness of the title to her land, all the efforts of herself and several of her children, were devoted to the making of a farm; and she has succeeded in improving the same as much as most persons in her comparatively helpless condition. At the time of making the said entry and purchase, one James Coleman was clerk of both register and receiver of the land office at St. Louis, (which I am informed was irregular and improper, as said offices were designed by law to be a check upon each other, to prevent fraud and embezzlement,) and as such clerk conducted both offices. "I was a poor widow, and did with much exertion raise the sum of one hundred dollars to buy the land. As I lived forty miles from St. Louis, and could not conveniently attend in person to enter the land, I sent my son James Lewis to do it for me. He went to St. Louis, and taking a friend with him to the land office, entered the said tract of land and paid for it in my name. The said James Coleman, acting for the United States receiver of public monies in that land office, received the money. My said son being illiterate and unable to read, the said James Coleman, fraudulently practising upon his ignorance, as a pretended evidence of the payment of the money, and of the entry and purchase of the said lot of land in my name, gave him a receipt of which the following is a copy, to wit :

SEPT. TERM,
1842.

Stephenson
v.
Smith.

"Receiver's Office, St. Louis, Mo.,
October 6, 1829.

No. 1891. Received from Samuel Johnson of——
county, Kentucky, the sum of one hundred dollars, being in
full for the west ½ of the S. E. ¼ of section No. 17, of
township No. 47, range No. 2 east, containing 80 acres,
at $1 25 cents per acre, one hundred dollars.

JAMES COLEMAN, for the receiver."

And with his own hand wrote upon the back of the re-
ceipt a memorandum of which the following is a copy, viz:
"The patent for the within west half of the S. E. quarter of
section No. 17, 47, 2 E., containing 80 acres, will issue, in
the name of Nancy Smith of St. Charles county, Missouri,
James Coleman, Land Officer, 5th December, 1829." My
son being unable to read the receipt and memorandum, re-
ceived the paper from the said Coleman and brought it home
to me; and I also being illiterate and unable to read, re-
ceived the same as satisfactory evidence of the purchase of
the said land. And it was not until a considerable time
thereafter, that I discovered the fraud that had been prac-
tised upon me, with this endorsement on the receipt. I, in
my ignorance, remained satisfied, not doubting that I should
get a patent for the land in due time. I am advised, and
therefore state the fact to be, that the common and accus-
tomed method of getting a final title for lands entered at the
public Land Office, is to take a receipt from the receiver, for
the money paid to him, a duplicate of which is sent by the
register to the commissioner of this general land office at
Washington City, who sends the patent to the purchaser,
through the land office at which the entry was made. I am
also informed and believe that it is lawful for the purchaser
to present the receipt of the receiver to the register of the
land office, and obtain. from him a certificate of purchase,
which being presented to the commissioners of the general
land office at Washington City, entitles the purchaser to a
patent.. The said Coleman being clerk of both the register
and receiver of the land office at St. Louis; and as I am in-
formed and believe, and therefore charge to be true, also a
public notary, relying upon my ignorance and helplessness,

proceeded formally to the execution of his plan, to cheat me of my land. I am informed and believe, and therefore charge that the facts are as follows : The said supposed Samuel Johnson, in whose name the receipt was nominally given is a fictitious person, and never had existence in fact. Said Coleman, in the name of the register of the land office at St. Louis, issued a certificate for the said half quarter section of land in the name of said Samuel Johnson, and kept possession thereof himself: he then forged and made an assignment of the said certificate in the name of Samuel Johnson, without naming any one as assignee, but leaving a blank for the insertion of a name, when and how it might best suit his fraudulent purposes. Then as notary public he wrote an acknowledgment of the assignment, purporting to have been made by Samuel Johnson, and attested and certified the same as taken and made before himself as a public notary, all of which proceedings were completely contrived and done by said Coleman, and were simulated and fraudulent and false. The said Coleman carried the said certificate to Kentucky, and there sold and delivered the same to one Thomas Stephenson ; but at what precise time, and for what price, and under what circumstances I am not informed. But I charge that there was no such person as the Samuel Johnson mentioned in the receipt, and in whose name the aforesaid false and forged assignment was made : that it was by that false and forged assignment that the said Stephenson claimed the title to the certificate and now claims my land : that the said assignment was in blank at the time of the bargain made by Stephenson for the purchase of the certificate from Coleman, and was filled up with Stephenson's name as assignee of Samuel Johnson after the contract was made, but whether filled up by Stephenson or Coleman I do not know. The said Stephenson having obtained possession of the said certificate in manner aforesaid, sent the same to the general land office at Washington City, and on or about the 16th day of October, 1834, obtained a patent for the said half quarter section of land in his own name as assignee of Samuel Johnson; and relying upon that patent as a title, he has brought a certain action of ejectment against me to recover

SEPT. TERM.
1842.

Stephenson
v.
Smith.

possession of the said half quarter section of land, which action is now pending in the circuit court; and I am now in danger of being turned out of the possession of the land which I have honestly bought and paid for, and improved by the labor of my family, and that by means of fraud, falsehood and forgery. I expressly charge that I alone have paid the money to the United States for the said land, and that I am the true and original purchaser thereof. That the said supposed Samuel Johnson is a fictitious person, the use of whose name by Coleman was a base fraud: that the pretended assignment of the certificate of purchase in the name of Johnson, and the certified acknowledgment thereof, were corrupt fabrications by Coleman without any truth or reality in them: that Stephenson bought the said certificate from Coleman and not from Johnson, and that he is not in law or equity the assignee of said certificate, nor of the rightful claim to the said land: that the patent issued for the said land to the said Stephenson, was issued by the officers of government by mistake, and upon false information as to the fact of the case, and ought not in equity and good conscience to enable said Stephenson to disturb me in the possession and enjoyment of the said land; and his attempt to do so is against equity and justice."

The complainant puts many questions, and amongst them asks what price Stephenson paid for the land. Coleman was not found, and a decree was entered against him for want of an answer: Stephenson answered, denying all knowledge of the situation and circumstances of the plaintiff and of her transactions with Coleman: admits that he bought the certificate from Coleman, and that it was endorsed in blank, and that the blank was filled by Coleman. He states that he bought the land in controversy, and another half-quarter section, for one thousand dollars; and afterwards says, that he did purchase the said certificate from Coleman for the price of ——, as above stated, and he had only stated the price of that land and of another half-quarter section, as had been above stated.

Many other statements are made in the answer, and as irrelevant and impertinent as some of those in the bill of

complaint; all of which will be passed over, as it is not contended that the bill is not sufficiently denied, so far as the defendant can be charged with a personal knowledge of the facts, except as to the price he paid for the certificate. It is stated in the bill of exceptions that the complainant introduced as evidence the original patent certificate of purchase of the tract of land in question, purporting to be in favor of Samuel Johnson, signed by William Christy, the register of the land office at St. Louis, which was admitted to be genuine and was introduced as evidence without objection. It is as follows:

<div align="right">

SEPT. TERM,
1842.

Stephenson
v.
Smith.

</div>

*Land Office at St, Louis, Mo.*
*6th Oct.* 1829.

No. 1891.

It is hereby certified that in pursuance of law, Samuel Johnson, of Kentucky, on this day purchased of the Register of this office, the lot or west half of the S. E. quarter of section No. 17, of township No. 47, north, in range No. 2, east, containing eighty acres, at the rate of one dollar and twenty-five cents per acre, amounting to one hundred dollars, for which said Samuel Johnson has made payment in full, as required by law. Now, therefore, be it known, that on presentation of this certificate to the Commissioner of the General Land Office, the said Samuel Johnson shall be entitled to receive a patent for the lot above described.

W. CHRISTY, Register.

The complainant then introduced as evidence, a paper purporting to be an assignment of said certificate to said Thomas Stephenson, signed Samuel Johnson. This will not be here set out, as it is but a common assignment. It is further stated that the plaintiff gave in evidence an acknowledgment of said assignment, purporting to have been made by said Samuel Johnson before said James Coleman, Notary Public. After these three papers follows this certificate: "I hereby certify that the foregoing are true copies of the original on file in the general land office." To this certificate are subscribed two names, and it is dated the 14th March, 1838.

The receipt, of which a copy with its endorsement was inserted in the bill and above copied, was also given in evidence.

It is then stated that the complainant introduced - two witnesses, Wm. N. Fulkerson and Edmund Christy, who testified that they were well acquainted with the hand writing of James Coleman ; that they have frequently seen him write, and the writing and filling up of all said papers they believe confidently to be in the hand writing of said Coleman ; that all the signatures of said papers which purport to be in the hand writing of said James Coleman, are his genuine hand writing ; that as to the signature of Samuel Johnson, they are not so confident, but that they believe it to be in the hand writing of said James Coleman, that it differs from the general hand writing of said Coleman, and is evidently an unnatural hand writing, but that there are points of resemblance betwixt it and the general hand writing which induce them to believe that it was written by him.— Said papers were all then read in evidence.    The said Christy also testified that the said Coleman did the business in the office of both register and receiver of public moneys at St. Louis for many years , but that he does not recollect whether he was acting in the year 1829 ; that the law does not recognize any deputy for either the register or the receiver, but that said Coleman staid in the office, and transacted the business for them ; that the said officers were in the habit of signing blank receipts and certificates, which were filled by said Coleman, and delivered by him to such persons as came to purchase lands; that the register and receiver being informed that he had been fraudulent, dismissed him from their employment ; but that they had no positive knowledge that he was guilty.

The complainant then introduced James Lewis, her son, as a witness, who stated that in the fall of 1829, his mother had an improvement, and was living on the land in controversy; that some time during that fall, Mr. Joseph Allen came into the neighborhood, and was entering many tracts of land in the vicinity ; that the complainant was in great trouble for fear that he would enter her improvement ; that she had not the money to enter the land at that time, and

that she feared it might be entered by Mr. Allen before she could raise the money to enter it; that from conversation of complainant and her brother, Francis Biggs, (who is now dead,) he understood that she got Mr. Biggs, who was going to St. Louis, to see about it, and see if any arrangement could be made to save the land; that when Biggs returned, he learned from conversation of complainant, that Biggs had reported that he had made arrangements, and that the land could not now be entered by Mr. Allen; and that his mother was now satisfied and easy, believing that Mr. Allen could not enter it; that a few weeks afterwards the complainant got him to go down to buy the land for her; that Biggs told him he would have to pay some interest on the money, and that if he paid the money and interest he would get the certificate; that he did go down to St. Louis, and got a man named Joshua Clark to go with him, to show him the land office, and applied to Mr. Coleman for the land, and paid him one hundred dollars for the price of the land and interest; and that Coleman took the paper and wrote on the back of it a memorandum, and gave it to him, which paper is the same now here shown, signed James Coleman, for the receiver, with a memorandum thereon, signed James Coleman; that both he and his mother are no scholars; that his mother cannot read; that he can read a little print; knows nothing about figures; that both he and his mother then, and for many years afterwards, believed it to be a good title paper for the land, and did not hear of any other claim for several years afterwards, when Mr. Lindsay, the agent of Stephenson, had been paying taxes on it, and was inquiring for it, not knowing where it was, until he found to his surprise that it was the land whereon the complainant lived. In answer to a direct question to that effect, by defendant, witness stated that he, witness, supposed Mr. Biggs may have borrowed the money to enter the land when he went down, and that the money, one hundred dollars, which he paid, may have been to repay the money borrowed by Biggs, but he, witness, went down to purchase the land. Witness may have heard his mother say about that time, that Mr. Biggs reported, when he came back, that the land was already en-

tered, but cannot recollect distinctly; he had fixed it some way that his mother was not so uneasy as she had been.

The defendant then gave in evidence the patent, which being in the usual form, will be omitted. There was no other evidence. I will first divest this bill of complaint of what, on reference to a master in chancery, where such an officer is found, would have been sticken out as impertinent, at the costs of the complainant, and will then proceed to consider the material part thereof, and the evidence produced by the complainant to support her claim.

She alleges that she is a widow; that she took possession of the land, and has ever since lived on, and cultivated it; that it is her only home, and except a small amount of personal goods, her only property; that not doubting the goodness of her title, she has for several years after making the entry and purchase, devoted all the efforts of herself and several of her children to the making of a farm, and the erection of the needful buildings on the land, and that she has succeeded in improving the same as well as most persons in her comparatively helpless condition. Here the complainant, impatient of the restraints imposed by the usual forms of bills in chancery, comes out like an actress, and after giving her opinion on the impropriety of the employment of Coleman to act for both register and receiver, exclaims, "I was a poor widow, and did with much exertion raise the sum of one hundred dollars to buy the said land. As I lived forty miles from St. Louis," &c., to the end. The two lectures on the law regulating the offices of the register and receiver, and the manner of obtaining a patent, if really the production of the complainant, shows her not to be so very ignorant as she pretends, and might retain their place for the novelty of the thing; but if the work of the solicitor, they and his authorities might more properly have been placed in his brief for the information of the court. Divesting the bill, then, of all this unimportant matter, and likewise of the abusive language so unmeaningly bestowed on Coleman throughout, for she has not pretended to make Stephenson a participator in the fraud, the material and substantive part of her complaint is this: that on the 5th day

SEPT. TERM, 1842.

Stephenson
v.
Smith.

of December, 1829, she, by her son and witness, James Lewis, applied to purchase the land in controversy; that her agent found at the land office a man named James Coleman, without authority to sell land, and paid the purchase money to him, and that Coleman, assuming to act in the name of the receiver, gave him a receipt for the same, signed James Coleman, for the receiver; and on that receipt endorsed an order that the patent should issue in the name of Nancy Smith, although the money appeared from the face of the receipt to have been paid by Samuel Johnson; that Coleman afterwards procured from the register the patent certificate, and having written an assignment on it in blank, signed by Samuel Johnson, and purporting to be acknowledged also by Johnson, before said Coleman, as notary public, sold it thus assigned in blank to Stephenson, at what price and under what circumstances she did not know. The evidence to support her claim to the patent certificate is, that on the fifth day of December, (two months, less one day, after the patent certificate issued,) she sent her agent to buy this land, and on that day he paid the money for the land; and this money she alleges is the money which the United States received as the price of that land. The time at which this money was paid according to her own showing, is the date of the endorsement made by Coleman on the receipt which he gave to her son and agent. It is not pretended that this date is wrong, and it is a part of her own evidence. This, then, is the time at which, according to her own testimony, the money was paid by her for the land, which, from her own showing also, must have been sold and paid for two months, (less one day) before, to wit, on the 6th day of October, 1829, the day of the date of the patent certificate.

All lands after the 24th of April, 1820, are sold for cash, and by the seventh section of the act of the 10th May, 1800, it is made the duty of the register of the land office to make entries in books, kept for such purpose, of all lands which persons apply to enter. See p. 460 and 770 of first volume of Land Laws. The complainant's money, then, did not pay for that land; if it did, either the patent certifi-

cate must have borne a wrong date, or the endorsment on the receipt given in evidence by herself must have borne a wrong date, and in either case it was her duty to show the mistake, if any such there were. If the date of the register's certificate were wrong, that might easily have been corrected by the entry on his books. No such mistake being proved, it may be safely assumed that there was no mistake, and consequently that her money did not pay for the land. That fact being established, it is quite immaterial whether Samuel Johnson be a real or fictitious person. But her son and witness supposes that Biggs may have borrowed the money to enter the land when he went down, and that the sum of forty dollars which he paid, may have been to replace the money borrowed by Biggs; and he also may have heard his mother say, about that time, that Biggs reported when he came back that the land was already entered, but cannot recollect distinctly. He *fixed* it some how that his mother was not so uneasy as she had been. From such a train of suppositions as those, if we are to conclude that this land was purchased with her money, then no man's title to his land is safe, so long as a widow can be found not too modest to claim it, and with a son for a witness, of ingenuity sufficient to connect the train.

A part of the complainant's testimony is documentary, viz: The register's patent certificate, the assignment thereof purporting to be made and signed by Samuel Johnson, and acknowledged by him before Coleman a notary public. Stephenson had told us in his answer, that these had been forwarded to the commissioner of the general land office; and unless they had been, we know that the patent would not have been issued; such is the law as will appear in the sequel. The law also requires these certificates to be preserved on file by the commissioner of the general land office. These papers certified to be copies of the originals on file in the general land office, were given in evidence by the complainant; and we are told on the record that the original patent certificate of purchase of the tract of land in question, &c., signed by William Christy, register, &c., was admitted to be genuine. The assignment, acknowledgment, &c., were

in like manner given in evidence, and the witnesses as above stated, proved the hand-writing of Coleman in all, whilst the record itself states that they were only copies.  Independently of this record, these witnesses are known to me to be men of strict integrity.  But they, and the learned counsel of Stephenson, had heard the bill of complaint read.  In this bill the complainant had been made to exclaim, "I was a poor widow, and did with much exertion raise the sum of one hundred dollars to buy the land!  I am now in danger of being turned out of my land which I have honestly bought and paid for, and improved by the labor of my family, and that by fraud, falsehood and forgery, &c."  They seem to have imagined that it was the recital of tragedy in real life. The counsel apparently unconscious of his own natural powers, and overcame by the recital of such a tale of woe, instead of tearing the mask from the face of the actress, admitted that her's was truly a case well calulated to awaken our sympathies, and only insisted that her wrongs should not be redressed at the cost of his client.  It may not then be a matter of surprise that the witnesses too were overcome by their feelings, and forgot to look at the papers before they testified.

I will, however, proceed to treat the subject as if there were no contradictory testimony; for I have no doubt that all the papers purporting to be executed by Coleman were so in reality ; about the signature of the name of Johnson the witnesses spoke of hesitatingly.

The subject has been adverted to merely to show how their judgments have been influenced by this totally irrelevant and impertinent tale of woe wrought into this bill of complaint.  But it was stated by the complainant's son that Mr. Biggs might have borrowed the money to pay for this land, and have entered it when he was down, &c.  If so, then we must presume Mr. Biggs would have seen that a proper receipt or certificate, as the case might be, was made out; or was he also unable to read?  The record does not say so. Where was the friend whom the complainant in her bill stated, that this son, witness and agent took with him to the land office?  Could not he read ?  Could not he tell the

agent what he was receiving when he took the paper from Coleman, which was then regarded as good evidence of title. This witness, ignorant and illiterate as he is represented, has shown more judgment than his mother in her bill of complaint. In his testimony he tells nothing about taking a friend with him to the land office. He says he got a man named Joshua Clarke to go along with him to show him the land office. It is probable they are one and the same person; but the witness more cautious than either his mother or her solicitor omits that epithet, and leaves it to be presumed that the man named Joshua Clarke having shown him the door of the Land Office retired, leaving himself and Mr. Coleman to themselves; and consequently it might not be thought strange, that this man was not called in to corroborate the testimony of the son in favor of the mother. Failing to find any thing more in the record about this friend, I referred to the complainant's statement furnished in pursuance of the 30th section of the act to regulate practice in the supreme court, &c., where I found these words: the bill alleges "that Coleman practising upon the ignorance of her son, gave him as evidence of the entry, a receipt in the name of Samuel Johnson; and upon that fact being discovered by a friend, said Coleman endorsed upon the receipt a memorandum importing that the patent would issue in the name of Nancy Smith." No such statement appears in the bill, nor any evidence of it on the record; and I apprehended that this friend, so called in the bill, but called by the witness a man named Joshua Clark, was not produced as a witness, because he might have proved something troublesome. To me it appears plain, that either this land must have been purchased by some one on the 6th day of October, or that it must have been withheld from sale by Coleman, by a pretended sale to Samuel Johnson for two months, till the plaintiff could raise the money in pursuance of a fraudulent agreement betwixt him and the complainant. The witness, her own son, stated that she got Mr. Biggs to go to St. Louis to see if any arrangement could be made to save the land; and that when Biggs returned, he understood from the complainant's conversation, that Biggs had reported he

had made the arrangement, and that the land could not be entered, and his mother became easy. No arrangement of such a business could be honestly made. It would seem then, either that she corruptly agreed by her agent Biggs, to give Coleman ten dollars to withhold this land from entry till she could send money to buy it; and that the land was pretendedly sold to Johnson in pursuance of such corrupt agreement; or that it was honestly sold to him at the time the certificate bears date, in neither of which cases could she hope for any relief in a court of equity. Had this friend taken with him to the Land Office, (according to the bill,) been produced as a witness, I have very little doubt he could have proved something of the kind. If the complainant had not known what that receipt purported to be when she received it, she would probably too have resorted to some of her more learned neighbors to read it to her. Her son has demonstrated to my satisfaction, that he might have read that receipt: he could read some print, and after a lapse of eight years could designate Coleman's receipt, and knew it was signed James Coleman for the receiver, with the memorandum on it signed James Coleman. I find it difficult to believe, that had this bill been preferred by this Mr. Joseph Allen, whom the witness seems to have intended to represent the spirit of speculation stalking through the land, that he would not have lost his cause; for I have rarely known a case where the plaintiff had as pressing occasion to charge fraud on others in order to divert attention from himself; and I can imagine nothing in this case, except the cry of fraud, widowhood, poverty, and the pretence of much honesty by the complainant, calculated to give her cause any appearance of justice.

I have hitherto treated this matter as if the United States, the grantor here, had been a simple individual vendor of this tract of land, and as if the State of Missouri had the right to declare the force and effect of titles granted by them, and power to enforce the right. To prevent the possibility of a doubt on this subject, the first section of the tenth article of our constitution declares in express terms, that the General Assembly of the State shall never interfere in the primary

SEPT. TERM, 1842.

Stephenson
v.
Smith.

disposal of the soil by the United States, nor with any regulation Congress may find necessary for securing to the bona fide purchasers the title in such soil. In anticipation, I suppose, of this provision in the constitution the complainant makes these points :

1st. That the fraud and forgery of Coleman, acting for both register and receiver, cannot vest the title, legal or equitable, to any part of the public land in any other person than the purchaser.

2d. That the actual sale of the land to Nancy Smith is the primary disposal of the soil, and all subsequent mesne conveyances are to be judged of by the laws of the State.

The first point, so far as it goes to assert that the legal or equitable title to any part of the public land can vest in none but the purchaser, is a truism which I cannot see any use in stating; but why the fraud and forgery (if any) of Coleman is introduced, I am not able to see. The second point assumes the very thing in controversy, viz., that the land was sold to Nancy Smith, notwithstanding the patent, and we are cautioned against any slavish respect for the name of a patent, because the United States have no common law, and the whole matter of issuing patents being a mere official regulation, a patent cannot in the United States impart the sanctity of a grant by patent of a King of England, the President of the United States not being the owner of the soil. Without wasting time in so unprofitable an inquiry as whether a President of the United States has not as much property in their public lands as a King of England in their crown lands, or as any sovereign in Europe has in his crown jewels, which last we are told that the revolutionary leaders in France demanded and obtained, as the property of the nation, from Charles the Tenth, in July, 1730, when he was retreating from the kingdom, it may be safely assumed, that whether there be any common law of the United States or not, those States, the real as well as nominal grantors, are under as strong an obligation to observe good faith towards the purchasers of the public lands, and to protect them in their titles, as the crown of England towards its gran-

tees : and that a citizen of the United States has as much right to expect a good title to his land from the head of his government, and to be protected in that title by the courts, as a subject of the King of Great Britain has. Nor can I agree that the case would be altered now, if, as the complainant supposes, this whole matter of issuing patents were merely an official regulation; but it is strictly a statutory regulation. By the seventh section of the act of 10th May, 1800, the register is commanded to give a certificate to the purchaser when payment is made, and on the production of that certificate to the proper officer, a patent will issue. Now, by the fifteenth section of the act of 26th March, 1804, the purchaser may apply to the register, and it will then be his duty under the ninth section of the act of 25th April, 1812, to transmit the certificate of purchase to the Commissioner of the General Land Office. Thence under the eighth section of the last recited act, the patent issues in the name of the United States, signed by the President of the United States, and countersigned by the commissioner of that office, being first recorded there, and it is then transmitted to the purchaser, through the land office where it was purchased. There stands recorded then in the General Land Office a patent to Thomas Stephenson for this land, and this court affirming the decree of the circuit court of St. Charles county, says, that the title to the said tract shall pass to and be vested in the said Nancy Smith, &c. If this court were by its decree to annul the patent, and order another to issue from the same office to Nancy Smith, the absurd assumption of jurisdiction would be obvious : but we having no superintending control over that special tribunal by which this patent is issued, say, that the officers have been cheated, and we decree the patent to Nancy Smith. The United States, vendors of this land (as they say) to Stephenson, assignee of, &c., being a sovereign power, and having courts to superintend and control their special tribunals, claim to have the mistakes of their agents inquired into in their own courts. They have admitted on record that

there is such a man as Samuel Johnson, and in conscience are bound to refund the money if the defendant, Stephenson, be not made secure in his title : but if they are amenable to the State tribunals, and the acts of their officers, done within the sphere of their authority, are to be declared null and void, then they should have been summoned as defendants to the bill of Nancy Smith, widow.

If Stephenson were to transfer that land to a citizen of Illinois, and his vendee were to commence suit against the complainant in the circuit court of the United States, he might either procure an exemplification of the record from the General Land Office, or she might be commanded to bring into court the very patent which this court have declared shall pass to the complainant, and it is not to be imagined that that court would recognize the authority of the State courts to declare void titles to land granted by the United States. In Wilcox v. Jackson, 13 Peters, 511, Mr. Justice Barbour, delivering the opinion of the court, says, "that the acts of Congress have given to the register and receivers of the land offices the power of deciding upon the claims to the right of pre-emption ; that upon these questions they act judicially ; that no appeal having been given from their decision, it follows as a consequence that it is conclusive and inevitable. This proposition is true, he continues, in relation to every tribunal acting judicially, whilst acting within the sphere of their jurisdiction ; and even when there is such an appellate power, the judgment is conclusive when it comes collaterally into question, so long as it is understood." And the grant of the pre-emption in that case was declared void only because the register and receiver had granted it on lands which had been reserved from sale. In that case he cites at the same page, the case of Elliott v. Piersol, et al, 1 Peters, 340. Where a court has jurisdiction, it has a right to decide every question which occurs in the cause, and whether its decision be correct or otherwise, its judgment, until reversed, is regarded as binding on every court. In the case of the U.

States v. Aredondo, 6 Peters, 691, it is said, "It is an universal principle that where power and jurisdiction are delegated to any public officer or tribunal over a subject matter, and its exercise is confided to his or their discretion, the acts so done are binding and valid as to the subject matter; and individual right will not be disturbed, collaterally, for any thing done in the exercise of that discretion, within the authority and power conferred. The only questions that can arise between an individual, claiming a right under the acts done, and the public, or any person denying its validity, are power in the officer, and fraud in the party." In the case above cited, Mr. justice Barbour tells us, the acts of such tribunals, when they transcend their power, are nullities, and may be disregarded by all the world. Such is not the case here. The officers granting the patent acted within their sphere strictly, and if there had been an appellate tribunal, to that tribunal an appeal might have been prayed. But fraud is alleged: and if the patent were fraudulently obtained, by whom is that fraud to be inquired into? If such a patent had been fraudulently obtained from a State tribunal, (and we have had such,) nobody could suppose the courts of the United States were competent to inquire into the acts of their special tribunals, which acknowledge no subjection to our laws or courts? I have before shown that we have no power to annul the patent, or to order one to issue to the complainant. The result then is, that because the land lies within the State, we have it in our power to annoy Stephenson, without affecting his title. The respect which courts of different countries and sovereignties show to the decisions of each other, forbids our chancery court from interfering with the decisions of this special tribunal of the United States; and whether it be judicial, or ministerial merely, is, according to the authority of the case above cited from 6 Peters, immaterial.

But this special tribunal is judicial, it is a special judicial tribunal. The register finds the facts, and reports them to the President of the United States, and on the

facts found and reported, he decides to whom the patent shall issue.   In Bagnell v. Brodinck, the Supreme Court of the United States say, Congress has the sole power to declare the dignity and effect of titles emanating from the United States.   And the whole legislation of the Federal Government in reference to the public lands, declares the patent the superior and exclusive evidence of legal title : until its issuance, the fee is in the government, which by the patent passes to the grantee, &c.   Afterwards, it is added, that if the patent issued by mistake, then the equity side of the circuit court is the proper forum : and a bill the proper remedy to investigate the equities of the parties, 13 Peters, 450.   And I will here add that the evident intention of the Supreme Court of the United States, was, that the validity of the patent could be inquired into only in the courts of the United States.   Otherwise the validity of the patent in that case might have been inquired into under an act as well on the law side as the equity side of our courts.   In this sense Mr. Justice McLean seems to understand it in his dissenting opinion.

I have now proved that the courtesy shown by courts of different sovereignties to the decisions of each other forbids us to intermeddle with the right of Stephenson. But when we consider that this court has no powers but such as are derived from the constitution and laws, and that our constitution has declared that the General Assembly shall never interfere with the primary disposal of the soil, nor with any regulation Congress may find necessary for securing the title in such soil to bona fide purchasers, and this Assembly has never attempted to make such regulations, it seems to me to be no less than usurpation of power in this court to say that they decree the title to pass out of the United States' patentee to the complainant, because they believe it to have been fraudulently obtained, when the tribunal for such purpose, appointed by the United States, have decided that it was fairly obtained.   For the United States having adjudged this patent to Stephenson, by a tribunal appointed for the

special purpose of deciding such claims, I cannot con-
ceive that the sovereignty of the State of Missouri con-
fers on her courts any more authority to declare that
decision erroneous, than the possession of Hercules and
his bodily powers would confer on a hero of modern days
to traverse the now known world, beating out the brains
of each person whom he might decide to be a cheat, a
thief, or a robber.

That our State courts have not regulated their deci-
sions according to the principle now contended for, I am
ready to admit; and I admit also, that I have heartily
concurred in at least one decision made contrary to the
principle for which I have contended. For a long time
after the transfer of this territory, of which the State is
now a part, by France to the United States, we had very
few if any complete titles to land. Our legislation was
accordingly adapted to the then existing state of that
kind of property. As early as the year 1816 a law was
made requiring deeds and bonds for real property to
which the vendor held the equitable title only, to be re-
corded; and making such deeds and bonds when duly
recorded, constructive notice to subsequent purchasers
of the same property. About the same time the legisla-
ture passed an act giving the action of ejectment to per-
sons claiming such property by deed of conveyance, and
ever since a similar act has been in force, and always so
modified as to embrace the several new titles that at dif-
ferent periods came into existence. This could cause no
conflict of judicial decisions, whilst, as under the terri-
torial government, the chief judicial power was confined
to courts created by acts of Congress. The necessities
of the community required that many transfers of real
property, held by incomplete titles, should be made;
many suits were instituted for such property. The first
case in this court that occurs to me, is that of Bird v.
Ward and Cravens, 1 Mo. Rep. 398. Ward and Cra-
vens made a settlement on lands of the United States,
which, under the act of Congress of the 5th of February,
1813, entitled them to a right of pre-emption in the pur-

chase of the land in controversy in that suit. They sold to Bird. He paid them, took possession, and made valuable improvements. Afterwards they procured from the register and receiver for their own benefit, an adjudication of the right of pre-emption. This court decreed the land to Bird. Such frauds were at the time very common, and justice required that they should be retained. The jurisdiction of the State court does not appear to have been questioned. There having been a contract betwixt the parties, I should have assented to the decree. But in this case there was no contract express or implied betwixt the complainant and the defendant. Stephenson did not know the plaintiff. Next in order comes the case of Morton v. Blankenship and Rider, 5 Mo. Rep., 346. In this case the holder of the patent certificate brought an action of ejectment against the holder of the patent for the same land, but under a junior certificate. This court decided that the evidence on the record did not justify the Commissioner of the General Land Office in vacating the first certificate, and directing the land to be sold afterwards to the holder under the patent, and consequently judgment was given against the holder under the patent. The case of Bagnel, et al. v. Broderick was decided in the Supreme Court of the United States subsequently to this case, and I will here add, that unless that court denies to the State chancery courts, as well as to its courts of law, the right to look behind the patent, I cannot see the wisdom of its decision. But I understand it as denying the power to the State courts both at law and in equity. In the cases of Hunter v. Hemphill, p. 106 of sixth volume of Missouri Reports, and in a case decided at St. Louis, not yet published, this court refused to look into the sales made by the registers and receivers to find whether they were regular. In Campbell v. Clark, it was contended by Clark, that he had the right to remove a quarter section corner, which, according to the testimony in the case, was not in the middle of the sectional line, and, in direct contradiction to the act of Congress on that subject, the circuit court instructed the

jury that if the quarter section corners on the several
sides of the sections are not in the middle of the lines
connecting the section corners, no regard is to be paid
to them. This court reversed the judgment of the cir-
cuit court given for Clark, on account of that wrong in-
struction. In fact, we know very little of the laws of the
United States, and are much more disposed to be censo-
rious in passing on the conduct of their officers than we
would be if we were in our legitimate sphere reviewing
the acts of those over whom we have some superintend-
ing control.

In support of the jurisdiction of this court, in this case, the
counsel for the complainant has cited the case of Rogers v.
Doe, on the demise of Barland et al., ?, Peters 656. That
case was cited in Bagnel et al. v. Broderick; and also in
Wilcox v. Jackson, 13th Peters above referred to; and in
each case the Supreme Court of the U. S. said, "That was
the case of a conflict betwixt two patentees, both claiming un-
der the United States." The elder patent was founded on a
certificate of the Register of the Land Office west of Pearl
river. The junior patent was issued on a certificate of the
Board of Commissioners west of Pearl river. The court be-
low instructed the jury that the junior patent of the plaintiff
in ejectment, emanating upon a certificate for a donation
claim, prior in date to the patent under which the defendant
claimed, would overreach the elder patent of the defendant,
and in point of law prevail against it. It appears that by
the mode of proceedings in Mississippi, they look beyond the
grant. This court, remarking upon that case, said, "That
in so doing, and in applying their peculiar mode of proceed-
ing to titles, derived through and under the laws of the U.
States, they violated no provisions of any statutes of the U.
States;" 13th Peters, Bagnel et al. v. Broderick, 450–1; and
Wilcox v. Jackson 517, ibidem.

In the case now before us, there was a patent on the side
of the defendant, which the complainant on the authority of
that case contends, is to be overreached by the testimony of
her son: that he paid money to a man found about the Land
Office, without authority to give even a receipt for money.

SEPT. TERM,
1842.

Stephenson
v.
Smith.

It was not attempted to show the application of the case, and I can perceive none, unless the complainant intends to insist that the evidence of her son, in her particular case, is to be accounted in this court of as high a character as a patent issued by the authority of the several acts of Congress above cited ; that seems to be the drift of the argument of the cause, for I cannot persuade myself that her counsel believes, that a State court has any authority to superintend and control in their action the special tribunals appointed by the United States, to issue the patents to those to whom they have sold the land.   To tell them that they are mistaken in the purchaser, is to tell them that they must believe others rather than their own records, (*i. e.*) in this case the plaintiff's pretendedly ignorant son, rather than the entries on their own books.   Each sovereign reserves to itself the privilege of correcting the errors of its own servants, and regards it as an act of usurpation for another to assume that privilege.

The decree of the circuit court ought then, in my opinion, to be reversed, and the bill dismissed, because, 1st. There is, in my opinion, no evidence that the complainant's money paid for this land, the Register's certificate bearing date the 6th day of October, 1829, and by her own evidence her money was not paid to Coleman till 5th December next, after that time: 2nd. If her money did pay for that land, the certificate must have been issued two months before the money was paid, in pursuance of a fraudulent and corrupt agreement betwixt Coleman and her, through Biggs her agent ; in such case she can have no claim : 3rd. Because this State courts have no power or authority, to decide on the correctness or incorrectness of the conduct of the officers of the United States who issue patents : 4th. Because, if the State courts will assume such power according to the rules of proceeding in chancery, the United States, the vendor to Stephenson, ought to have been made co-defendant in this suit.