MAGUIRE AND OTHERS, Defendants in Error, v. PAGE AND MORTON, Plaintiffs in Error.

1. By act of congress of July 4th, 1836, an unconfirmed Spanish claim of one J. M. in and to a tract of land within the St. Louis common, the paramount title to which was in the city of St. Louis, was confirmed to the representatives of the said J. M. A., B. and C. were the legal representatives of J. M. as to portions of this tract, and had all his title to such portions. B. by falsely representing himself to be the legal representative of M. (not however by derivation of title through A.) as to that portion claimed by A., under J. M., as well as to that portion for which he had a derivative title from J. M., procured a compromise deed from the city of St. Louis, embracing the portion claimed by A. This compromise deed was made to B. under a resolution of the board of aldermen of the city authorizing the conveyance to him, as the representative of J. M. A. did not appear before the board of aldermen to claim a conveyance to himself as the representative of J. M., nor did he know of the proceedings of the board of aldermen, nor of the conveyance by the city to B., nor of any claim by B. to the portion claimed by himself. Held, that the deed thus obtained by false representations did not enure to the benefit of A. as to that portion claimed by him by derivative title from J. M.; and that a petition against B. setting forth the facts above stated and praying a decree for the tract so claimed by A. as above stated, upon the payment of the compromise money—$20 per acre—with interest, contained no equity.

*Error to St. Louis Court of Common Pleas.*

The facts sufficiently appear in the opinion of the court.
*Shepley & Williams*, for plaintiff in error.

I. The plaintiffs are in no condition to complain, and have no equity however unauthorized the act of the city of St. Louis may have been in making the deed to Morton. The city of St. Louis had absolute title to the land in controversy. The city then having the title, without the representatives of Mackay having any claims upon them whatsoever, could dispose of the land in conformity to law to whomsoever she pleased. The city itself is to decide what lands are in controversy, and with what claimants or set of claimants it will settle and compromise. The city exercised the right it possessed, and by its resolutions offered to compromise to George Morton, P. M. Dillon and Frederick Dent, to them as individuals and to them alone. The resolutions and ordinances of the city offered no compromise and gave no privilege to the representatives of James Mackay; therefore, if it be true that the city had no right to compromise with Morton as to this land, because he represented no antagonist title, then the title is still in the city. The finding states that neither Rutgers nor his representatives knew of the conveyance by the city, nor of the proceedings and resolution of the board until years after it occurred, and that there was no one before the board representing Rutgers. Yet they set up this claim just as if they had appeared before the board, offered and requested a compromise, and Morton had, by fraudulent representations, induced the city to compromise with him and not with them.

II. But Dent, whose title Morton had purchased before the deed of the city was made to him, though it was not conveyed to him until afterwards, was before the committee claiming to be the representative of Mackay for the land afterwards conveyed to Morton as the assignee of Dent, and the city was authorized to convey to him.

III. Even if it be admitted that the plaintiffs, at the time the city conveyed to Morton, or shortly after, would have been entitled, upon payment of the sum paid by Morton, to a conveyance, yet they now have no equity that they can enforce. They must show that they at once claimed the benefits of the com-

13—VOL. XXIII.

promise, and insisted that it enured to them. It must conclusively be shown that they considered it then a thing beneficial to them, and that they put forth their arm to grasp it. There is no evidence in this case which shows, or tends to show, any other state of facts than that the plaintiff, for years after the deed was made to Morton, relied solely under their title under Mackay, and were content to abide by it as the paramount title. There is no evidence that for years, after the deed was made, they were willing to pay twenty dollars per acre, required by the city. There is no evidence but that, until after the decision in the case of Mackay v. Dillon, they were always ready and willing to encounter the city title, whether it was held by the city, Morton, or any one else. There was no movement made as to payment or tender of compromise money paid, and no effort, in any way, to obtain the city title by the plaintiffs, until after the lands had risen enormously in value.

IV. If a fraud or deception has been practiced by Dent or Morton, it is a fraud upon the city, and not one against the representatives of Rutgers, with whom Dent was in no way interested, he asserting an antagonistic title to theirs. Neither Dent or Morton claimed or asserted title through Rutgers.

V. No fraud or deception was practiced by either Dent or Morton upon the board of aldermen or the mayor, and the finding of the court is erroneous in this particular. Morton's position as a member of the committee on commons, under the facts in evidence, in no way affects this case.

VI. Even if, as against Morton, the plaintiffs would be entitled to the relief prayed for, yet, as against Page, they are not entitled, unless it can be shown that he had knowledge or notice of these transactions, or held the property in secret trust for Morton's benefit; and the finding of any such facts by the court is erroneous. That there was knowledge or notice on the part of Page is not pretended, but the effect is to prove that he holds this property for Morton's benefit. The finding of court, that he held it in secret trust for Morton, is not warranted by the evidence. If originally held by Page in secret trust, yet there

was no trust after the purchase by Page at sheriff's sale. Morton says he knew nothing of it.

VII. No decree should have been made without making the land subject to payment of the debt to Russell.

*T. Polk*, for defendant in error.

I. Morton having procured from the city a deed for the portion of the Mackay claim belonging to Rutgers by falsely representing himself as the owner thereof, held the same in trust for Rutgers and his representatives. (Perkins v. Hays, 1 Cooke, 166 ; Lloyd v. Spillet, 2 Atkyns, 148 ; United States v. Hughes et al., 11 How. 552 ; Stephenson v. Smith, 7 Mo. 610.)

II. The defendant, Page, having notice of all the facts, and receiving his conveyance of the land, without consideration, holds the same upon the same trusts as affected it in the hands of Morton. (Wilson v. Mason, 1 Cranch, 100 ; Murray v. Ballow, 1 Johns. Ch. R. 566, 400, 136 ; Graves v. Graves, 1 A. K. Marsh. 166 ; 2 id. 149.)

RYLAND, Judge, delivered the opinion of the court.

Maguire and others brought their action, in the nature of a suit in chancery, against Page and Morton, in the St. Louis Common Pleas, to declare a constructive trust in relation to a piece of ground in the St. Louis common, on account of alleged fraudulent contract of Morton in procuring the legal title thereto from the city of St. Louis ; alleging that defendant, Page, holds under Morton, with notice of plaintiffs' right, or, as the trustee of Morton, under secret trust. The same transaction is found in the case of Swartz v. Page, heretofore before this court, reported in 13 Mo. 603. (See statement in that case.)

There was conceded to James Mackay, in his lifetime, a tract of land, a part of which was embraced within the St. Louis common, as it (the common) was surveyed by the United States. The portion lying outside the common was con-

firmed in 1816, and the part within the common, containing about 209 arpens, was confirmed on 4th July, 1836. The said Mackay, by his will, authorized his widow and executrix to sell and convey portions of his real estate. The executrix sold and conveyed to Arend Rutgers, on the 5th day of May, 1825, a tract of land containing 33 arpens.

The plaintiffs set out and show their derivative title under Rutgers. In March, 1825, the sheriff of St. Louis county conveyed to Abner Blaisdell, under judgment and execution against the estate of Mackay, a lot of 15 19-100 acres, bounded east by land of Rutgers, north by land of Chouteau, south by Soulard. Derivative title to that lot from Blaisdell to Morton was shown. Of the 33 arpens sold by the executrix to Rutgers, 8½ acres lie within the survey of the common; this lot is claimed by the plaintiffs in this action, and the decree of the court below was made therefor in their favor.

On 2d of April, 1836, the defendant Morton, Patrick M. Dillon and Frederick Dent, were owners of portions of the Mackay claim lying within said survey of the common. Morton, in addition to the portion for which he held a deed, also had a contract with Dent by which the latter had agreed to convey to him an additional part thereof, to which he, Dent, orally represented that he held the Mackay title, and which covered the 8½ acres belonging to Rutgers. But Dent had not the Mackay title to this 8½ acres. The committee of the board of aldermen of the city of St. Louis on commons, of which committee Morton was a member, made a report recommending that the mayor and board of aldermen convey all their right and title to the land within the survey of the common, known as the Mackay claim, to the representatives of said Mackay, for and in consideration of the sum of twenty dollars per acre. The legislature having, by an act passed in March, 1835, empowered the mayor and board of aldermen of the city of St. Louis, to settle or compromise, on the most advantageous terms, with all persons having claims within the common conflicting with the claim of the inhabitants of the city of St.

Louis, the board of aldermen passed a resolution that P. M. Dillon, George Morton and Frederick Dent, being the legal representatives of James Mackay, shall receive deeds for the land claimed by them, and which is within the survey of the common, by their paying twenty dollars per acre therefor.

The claim of Arend Rutgers was never presented to said committee, nor did any one claim any part thereof before the said committee.

Before the report of the committee on commons recommending a compromise, and before the resolutions of the board in relation thereto, Dent had bargained with Dillon for that part of the Mackay concession conveyed to Dent by the sheriff's deed, dated in August, 1825, which lies west of St. Ange avenue, and had made a verbal bargain with Morton for all that part so acquired by said Dent, lying east of St. Ange avenue. After said resolutions were adopted, Morton, fearing that Dent would not stand to his bargain, and having heard Dent state that by virtue of his deed from the sheriff, in 1825, he was entitled to all of the Mackay concession lying within the St. Louis commons, procured a deed to be drawn up, describing all land lying within the Mackay concession, east of St. Ange avenue and west of the east line of the commons, including that claimed by Rutgers, as well as that claimed by himself, and that claimed by Dent east of St. Ange avenue, and presented it to the mayor of the city to be by him executed ; representing to the said mayor at the same time, that he, Morton, had bargained with said Dent for his, Dent's, interest in the land described in said deed, and that Dent's claim under Mackay extended to the east line of the commons.   Morton, by said representations, which are charged to be false, on the 10th day of May, 1836, procured the execution of the deed by the mayor, whilst in fact Dent's deed from the sheriff did not include the said land claimed by Rutgers, nor any part of it.

Dent and wife afterwards, in March, 1837, conveyed by deed to Morton lands, the description of which is the same as in the deed from the mayor to Morton, so far as it relates to the land

in controversy. The deed from the mayor of St. Louis to Morton was filed for record the same day it was executed, 10th May, 1836. Notwithstanding the fact of the filing and recording of this deed appears by the certificates endorsed thereon by the proper officer, yet the court below finds that "Arend Rutgers died in 1837, without having learned the proceedings of said committee or said board, or of any conveyance by the city to said Morton, nor of any claim by said Morton or Dent to any part of the land claimed by said Rutgers or his said representatives ; nor did any of said Rutgers' representatives know or hear of said proceedings of said committee or board, or of any conveyance by the city to Morton, nor of any claim by said Morton or Dent to any part of said Rutgers' tract, until long after said conveyance by the city to Morton had been executed." The counsel for the plaintiffs, in his statement of the case, says: "All this remained unknown to said Rutgers and his representatives until 4th March, 1851, when the plaintiff, Maguire, tendered to the defendant, Page, the full amount of the compromise money paid by Morton to the city for the premises in controversy, with interest thereon, as also costs and expenses, and demanded a deed of said premises, which was refused."

The sheriff's deed to Frederick Dent, in the bill of exceptions, was for land sold by virtue of an execution in favor of B. & J. Pratt, against the executors of the estate of James Mackay, deceased ; the execution was returnable to the July term of the circuit, 1825, and the land is described as a tract of land containing two hundred arpens, part and parcel of a concession to said James Mackay, situated south of Auguste Chouteau's mill tract, bounded north by said Chouteau, west by vacant land, south by vacant land and land of A. Soulard, and east by land of A. Rutgers and J. Mullanphy ; all the right, title, claim, interest, estate and property of the said James Mackay to this tract, was sold by the sheriff to said Dent, the deed being dated 6th July, 1825.

Judgment was rendered in this action against Morton by de-

fault, and Page having answered, the case was submitted to the court.

Morton was introduced as a witness by the plaintiff. He stated that he did not answer the bill of the plaintiffs; he had no answer to make. He says : " I got a deed from the city to the land in dispute ; I obtained it as others obtained theirs, who compromised with the city, by presenting my deed to the mayor and having him sign it. Before the committee had acted on our claims, Mr. Dillon and myself bargained orally with Dent ; Dillon, for all of Dent's claim west of St. Ange avenue, and I, for all east of said avenue. After the report of the committee, Dillon told me that Dent was going to fly the bargain, and I therefore included in the deed, which I handed to the mayor, all that Dent represented he had bought at sheriff's sale ; I did that to hold Dent to his bargain. I had it surveyed and the description made out by De Ward, the city engineer, and the deeds made out from that ; I was one of the committee on commons ; no objection was made to my claim by any of the committee, that I ever heard of ; I made no representations to the committee other than that I was entitled to the land as others who had claims, to the committee. I was entitled to that land as all others were who had Spanish claims, and presented my claim to the committee in the same way. I do not recollect the committee passing upon my claim ; no dissenting voice to mine, that I recollect of ; my deed did not contain more than I claimed. I claimed under the Mackay claim ; I had fifteen acres and more there ; then I bargained with Dent and agreed to purchase from him ; I did not state to the committee the description of the land I claimed ; I did not exhibit my title and papers to the committee, as I recollect ; I don't recollect whether the committee reported in writing ; I don't recollect who wrote the deed. The description was from De Ward's survey. I was aware at the time that Rutgers had an adverse claim to the land there. Dent told me he (Dent) had a better title by an old sheriff's deed. I bought from Messrs. Gorman and White fifteen acres or thereabouts ; I un-

derstood that Gorman got the same from some one who had
bought from the sheriff; I never saw that deed, that I now re-
collect; I don't know what was called for by the deed of sher-
iff to Dent; never examined it; I had Mr. Dent's assurance
that his was the best title; I had no deed from Dent when I
compromised with the city; I got a deed from him afterwards;
I had made the representations to the committee; I only spoke
before them of the quantity claimed on account of my bargain
with Dent.    Dent wanted to sell to Dillon, and Dillon told me
that Dent was about to take advantage of me, and I got my
deed from the city; I paid Dent about $1100.    I should not
have claimed Rutgers' land, under my agreement with Dent,
had I known that the sheriff's deed to Dent, bounded the land
east of Rutgers; but I bargained with Dent, and claimed only
according to Dent's statement and representations to me.    The
boundaries of what is in the deed of Dent to me includes this
land in dispute.    The $8\frac{1}{2}$ acres were not in the first bargain.
He brought me a deed, and I paid him $1100 for the interest
which he represented as his."

From the view we take of this case, it is not necessary to
trace the title from Morton down to Page.    There is no ques-
tion as to the superiority of the title of the city.    That the title
was in the city to the portion of the Mackay concession lying
within the common, is conceded by both parties; nor can there
be any longer a question on this subject.    The authority given
by the act of the legislature to the mayor and board of alder-
men to settle and compromise the conflicting claims of persons
claiming title to lands within the city commons, and the acts
done by said board under and by virtue of such authority, are
also valid and binding.    Here, the compromise is specially
named and authorized to be made with P. M. Dillon, George
Morton and Frederick Dent, legal representatives of James
Mackay, deceased.    It is so made, and the mayor executes his
deed to Morton for forty-nine acres and forty-five hundredths
of an acre, which is specially designated in said deed; the con-
sideration thereof being $900, or twenty dollars per acre for

forty-five acres, the four fifty-five one-hundredths acres being taken up in the avenues running through and bounding the land. Morton claimed this land by virtue of his derivative title from Blaisdell, and by virtue of a bargain made with Dent. He made no claim in the name of Rutgers or his representatives. He did not pretend that he had any interest to the Mackay claim through Rutgers, or through any one claiming under Rutgers. He claimed through his grantors up to Blaisdell and through Dent.

Now had Rutgers presented his claim to the board for compromise, the board, no doubt, would have been equally as willing to accept the terms from him as from others, and would have authorized a deed to have been made for his claim. But Rutgers does nothing to bring about such a compromise; for nothing appears on this record to the contrary but that he did suppose his title through Mackay's concession better than the city's title to the land within the common. It was long after Rutgers' death that the Mackay claim was pronounced inferior, to the city's title. (Mackay v. Dillon, 4 How. S. C. 421; Le Bois v. Brammell, 4 Howard, S. C. 449, decided by the Supreme Court of the United States in January, 1846.) Now admit the worst phase against Morton that can be drawn from the facts and documents appearing in this case, and he can not be charged with any fraud or misrepresentation before the board of aldermen or to the mayor, against Rutgers or those claiming under him. Grant that he claims more land and different land, and pays for more land and other land than Dent and himself; both had a just right to claim. But this did not preclude Rutgers from making his claim, obtaining his deed, and holding to such land under the city as the deed from the city would have conveyed to him. But it is said Morton got the land that Rutgers would have got from the city, and got it by making false representations to the city; not under the Rutgers' claim though, nor in defeat of the claim, if it had been made properly and at the proper time. Then Morton must claim

adversely to the Rutgers' claim, and can not be converted into a trustee for Rutgers and those claiming under him.

How long can it be supposed that the city was bound by her offers and resolutions to compromise her title to the common with those claiming adversely to her, and that, too, at twenty dollars per acre? Could Mackay's legal representatives, or Rutgers or his legal representatives, have demanded of the city that in 1846 she should carry out her offers and resolutions for compromise, which had been made ten years before, and had remained so long unnoticed or disregarded by the claimants? Will any one pretend that such a demand would have met with the slightest respect from the city? Rutgers nor Mackay, nor either of the representatives of either Mackay or Rutgers, had any meritorious cause to demand of the city a compromise. They had paid the city nothing; there was no consideration moving from them to the city. But she voluntarily resolved to compromise the claim of the Mackay title with Dillon, Morton and Dent; and did so, conveying to Morton all his and Dent's claim, as set forth by Morton. Would any one pretend that, if the Mackay title had prevailed over the city's title, that any portion of the Rutgers' claim within the compromise between Morton and the city would have been affected by such compromise, so as to be thereby taken from Rutgers' representatives? Would it not have been a complete answer that Rutgers and the representatives of Rutgers were strangers to such compromise; had nothing to do with it, and can not be bound by it? Suppose it was a fraud perpetrated by Morton against the city, what right have Rutgers' representatives to come into a court of chancery and ask that the fraud may be converted to their benefit? It was not perpetrated by their agent, nor with their means, nor in their names, nor against their rights; for, so far as regards the city, they had adverse claims, and if they refused or omitted to avail themselves of the terms of compromise offered by the city, it is their misfortune. Morton's compromise did not prevent Rutgers from compromising; and

had he done so, then, had there been any conflict or contro-
versy about any particular part or tract of land acquired by
each other under such compromise, the courts would have de-
termined to which one the land in dispute properly belonged.
But Rutgers, so far from compromising, appears to have to-
tally disregarded the whole matter during his life, and his rep-
resentatives for many years after his death. For, although the
deeds of the city to Morton, and of Dent to Morton, have been
recorded in the proper office, yet the court below finds that Rut-
gers never learned any thing about it, and his representatives
not for a long time thereafter. Why was this? It must be
because Rutgers relied upon the 'strength and validity of the
Mackay title, or was unwilling to trouble himself to know what
the city was doing or had done in regard to her title ; or was
not willing to pay the price asked by the city, per acre, for her
title, by way of compromise.

There is nothing on the record showing that Morton repre-
sented Rutgers or his heirs by purchase or private arrange-
ment, made by him with them ; nor is there any thing showing
that the $8\frac{1}{2}$ acres were included by the mayor's deed to Morton
by their consent ; and they can not be allowed to lay by for ten
or fifteen years until the Mackay title has been declared un-
availing against the city's title, and then come forward and
charge fraud upon Morton, and pray that the fraud may be
converted to their advantage. So far as the Rutgers' repre-
sentatives are concerned, Morton takes the place of the city.
As they could not compel the city now to compromise, I see
no better claim in their favor to compel Morton. The city
never had Rutgers' title to the land in controversy ; the city
had no claim under Mackay or under Rutgers, or their repre-
sentatives. The city had a claim of her own—a claim adverse
to Mackay and Rutgers ; and when she compromised, she gave
up her own superior title. Morton never got Rutgers' title
from the city. He got the city's title to a piece of land to
which Rutgers had a claim arising in opposition to the city's
title. He did not get the city's title by pretending he owned

Rutgers' title. It is laid down that, where a person by fraud obtains a title to that which equitably belongs to another, he shall be considered in the light of trustee to that other, and will be compelled, in a court of equity, to convey to him his legal title. What was Rutgers' title here? At most, so far as regards the city's title, he had the right, if he thought proper, to purchase it at twenty dollars per acre; that is the full extent of his right. He neglects to do this, and another gets a compromise, who succeeds by asserting that his claim embraces such a contract; he obtains a deed; he made improper and false assertions in regard to the extent of his claim, and thereby obtains a deed for a part not properly within his claim, but in the claim of Rutgers. The title which Rutgers had utterly fails; he omitted to get the city's title. Now what right has he or his representatives, after this, to come forward, because the city was imposed upon by her grantee, and make that grantee his trustee. The cases of Perkins et al. v. Hays et al., (1 Cooke, 163,) United States v. Hughes et al., (11 Howard, 552,) and of Stephenson v. Smith, (7 Mo. 610,) are nowise similar or analogous to the case at bar. It will be useless, therefore to extend this opinion in commenting on them. The doctrine of resulting trusts, laid down by Lord Hardwicke, in Lloyd v. Spillet, (2 Atkyns, 150,) is recognized, and would be applied where the facts warrant it.

In Hill v. Reardon, (2 Russell, 645, 3 Cond. Eng. Ch. 253,) will be found a case more analogous to the one at bar than any other we have as yet been able to find. The head note of this case is as follows: "Under the conventions with France for indemnifying British subjects for confiscation of their property by the French revolutionary government, and the act of 59 Geo. III, ch. 31, compensation for an estate and the movable property on it was awarded by the commissioners to 'A.' as executor and residuary legatee of 'B.' A bill was filed by one of the co-heiresses of the wife and children of B., all of whom had died during his lifetime, alleging that by the then existing laws of France the will of 'B' was inoperative, and

that a moiety of the property did not belong to him, but to his wife, from whom it had descended to the children, and from them to the plaintiff and another person as co-heiress with her, and claiming for such co-heiresses a moiety of the compensation. No claim had been duly made before the commissioners in respect to the alleged title which the plaintiff sought to enforce ; neither had there been any discussion before them as to that title ; but the facts out of which it arose were disclosed or alluded to in the proceedings which led to the award. Held, that, under such circumstances, the Court of Chancery would not interfere to relieve the plaintiff."

Before the commissioner appointed under the act of parliament, 59 Geo. III, ch. 31, to carry into effect several conventions for liquidating claims of British subjects and others, against the government of France, Mr. Devereaux, as representative of a Mr. Fanning, caused three claims to be duly entered in the register kept by the commissioners, and in support of them brought forward the following state of circumstances, substantially : "In 1777, James Fanning, by birth an Irishman, purchased an estate called Roche Talbot, situated in a district which was then a part of the provinces of Maine and Anjou, but is now in the department of the Sarthe, in France. He resided there until February, 1791, when the progress of the revolution induced him and his daughter to come to England, and in September, 1792, he was followed thither by his son. His wife had died in 1788. The local authorities having prevented the agents of the family from collecting the rents, the son, in November, 1792, addressed a letter on the subject to the directory of the department of the Sarthe, in which he affirmed that 'Roche Talbot' had been bought with moneys belonging entirely to his mother. In February, 1793, the father, son and daughter addressed to the French minister of foreign affairs a letter of remonstrance on the injustice of excluding them from the income of the property, and circumstances were stated in the letter from which it was manifest that the deceased, Mrs. Fanning, had had, and that after her death

her son and daughter had, an interest in the lands. Their re-monstrances were unsuccessful, and the rents were collected by the functionaries of the public treasury. In September, 1793, the national convention made a decree for confiscating the pro-perty of all English, Irish, Scotch and Hanoverian subjects ; and in the following March, a small part of 'Roche Talbot' was sold by the department of the Sarthe, and other portions of it at subsequent periods; but the woodlands, for the most part, remained unsold. The son died unmarried and intestate in 1796, and the daughter died unmarried and intestate in 1801. In 1804, Mr. Fanning made his will, by which he gave lega-cies to some charities and the residue of his property to Deve-reaux, and appointed Devereaux and another person his exec-utors. Mr. Fanning died at Paris in August, 1806, without leaving any issue him surviving. The will was not proved till 1817, and it was then proved by Devereaux alone. In 1814, Devereaux, as executor of Fanning, claimed restitution of the unsold woodlands as within the fourth additional article of the treaty of the preceding May. The British commissioners ap-plied to the French authorities on the subject, and by the orders of the minister of finance he was, in January, 1815, put in possession of that part of the estate. Shortly aftewards, he was called upon by the public authorities to pay a sum of 13,530 francs as the amount of the duties which became paya-ble on the successive devolutions of the woodland. In esti-mating the duties, it was assumed that upon the death of the mother one-fourth of the property had descended to the daughter, and another fourth to the son, as heirs of their mo-ther ; that upon the daughter's death, one fourth part of her interest went to the father and the remaining three-fourths to her brother ;* that upon the brother's death, one half of his share devolved to his father, and that the whole interest of the father had become vested in Devereaux. The formal instru-ment, requiring payment of the duty, stated that Mr. Fanning

---

* Although it is thus stated, it appears that the son died first.

had acquired the property *dans sa communauté avec la dame son épouse*, and that Mr. Devereaux had been put into possession as heir and testamentary executor of Mr. Fanning. Under these circumstances, Mr. Devereaux claimed compensation, first, for the amount of immovable property which had been confiscated, with interest thereon; secondly, for the amount of the movable property which had been confiscated, with interest thereon; and, thirdly, for the intermediate profits of the unsold woodlands from time to time, when they were put under sequestration, until the date of their restitution. The claims were investigated before the commissioners, and by awards of 29th September, 1820, and 18th and 23d of January, 1821, large sums were ordered to be paid to Mr. Devereaux as executor of Fanning, in respect to each of the three claims, and ordered a due proportion of the *rentes*, which were at the disposition of the commissioner, to be transferred to him.

" On the 17th of March, 1821, Christopher Hill and Ann his wife, who was stated to have become on the death of the daughter of Mr. Fanning, in 1801, and to have ever since been one of the co-heiresses of Mrs. Fanning, and also one of the co-heiresses *ex parte materna* of both her son and daughter, filed their original bill in the Court of Chancery, asserting a right to a portion of the *rentes* so awarded, though they had not made any claim before the commissioners. They alleged that ' Roche Talbot' had been bought with the money of Mrs. Fanning, and had been conveyed to her husband and her and their heirs, as tenants in common; that upon the death of Mrs. Fanning, her moiety of the estate descended to her son and daughter as tenants in common in fee, and upon the death of the son vested wholly in the daughter, and upon her death, in the plaintiff, Ann, and the defendant, Mary Lewis, the other co-heiress; that the plaintiffs and Mary Lewis were entitled to a moiety of the sums awarded for compensation; that, by the law of France, property which had been sequestered or confiscated, on account of emigration of the owner, belonged, if he died before the 5th of December, 1814, to the heirs and

not to devisees or legatees ; that Devereaux, therefore, had not, under the will of Fanning, or as his executor, any interest in the property or in the *rentes* awarded in lieu of it ; and that he had preferred his claims to the commissioners without the knowledge of the plaintiffs, or of Mary Lewis, or of the attorney general. It was suggested also that Fanning, at his decease, left no heir or next of kin, and the attorney general was therefore made defendant. Devereaux answered the bill, alleging that, by the law of France, the property, at the time of the death of Fanning, belonged to him, and that he had power to dispose of it by will, and the only valid title to the property and to the compensation was in his executor and residuary legatee. He insisted that the court had no jurisdiction, and that the decision of the privy council was final. The commissioners of liquidation stated that they had not been able to form a satisfactory judgment as to the conflicting claims of plaintiffs and Devereaux ; or, as to either of the two questions, whether Fanning, the father, after the decease of his wife and children, became entitled to the whole estate ; and whether he had at the time of his decease any power to dispose of it, or of any compensation to be made in lieu of it. There was evidence of the pedigree of the plaintiff, and of those alleged rules of French law on which the plaintiffs and defendant respectively relied.

" At the hearing, the vice chancellor dismissed the bill, on the ground that the court had no jurisdiction. The plaintiffs appealed. Before the lord chancellor, the plaintiffs' counsel contended that Devereaux could not receive the compensation otherwise than subject to such rights as might exist in other British subjects, and that there was nothing in the conventions or in the act of parliament to destroy those rights ; that the award gave Devereaux the legal title to the money ; but, as no interest in the estate, in respect of which the compensation has been awarded, was ever transmitted to him, he must hold that money for the benefit of those who represented the true owners of the property for which it is substituted.

" The defendant's counsel urged that the commissioners and

privy council, in making the award in favor of Devereaux, had decided two points; first, that "Roche Talbot," with the movable effects on it, was property for which the representative of those who, at the time of the confiscation, were owners, had a right to indemnity; secondly, that Devereaux was the representative of those owners, and was entitled to receive the sum allotted for compensation. On the other hand, the plaintiffs allege that, though compensation was due for the confiscated property, no part of that compensation should have been awarded to Devereaux. He was devisee and executor of Fanning. One moiety of the property, it is said, never belonged to Fanning, and Fanning had no power to dispose of the other moiety by will; consequently, the title of Devereaux was altogether chimerical. Admit the truth of the whole case stated in the bill, what would be the result? Why merely that the award of the commissioners was altogether erroneous. The bill therefore is filed, not to enforce equities, but to set aside the award of the only competent tribunal—to annul the legal title which that tribunal has established, and to set up another title purely legal and adverse. Such a jurisdiction does not belong to the court. Suppose we have no title (say the defendant's counsel) to the *rentes* which have been awarded to us, how does the plaintiff thereby acquire a right to have the money paid over to him? Our want of title might afford a reason for the calling upon us to pay back the money to the French government, from whom we received it; but it furnishes no reason for handing it over to the parties who never attempted to establish their title against France.

"[The Lord Chancellor: In case of trust or fraud, I have not the least doubt of the jurisdiction of the court to interfere. It is said that, in cases of perfectly adverse titles, there is no jurisdiction. Suppose it were so, yet there must be jurisdiction to the extent at least of examining whether the titles are perfectly adverse, and therefore what is called the preliminary objection can not be gone into without a full discussion of the facts and merits of the case.]

14—VOL. XXIII.

"The first question here is, can Devereaux be considered a trustee? Is there such a statement of facts on the record as clothes him with the character of trustee? And if there is, what is the effect of the conventions and act of parliament and the awards of the commissioners on the trust so reposed or represented as being reposed in him? Secondly. If the case before the court is not one of fraud or trust, but of perfectly adverse title, the question will assume this shape: 'You, Devereaux, have gotten a decision in your favor from the commissioners. I never claimed before them, and I have no decision awarding compensation to me. But you have gotten that which, if I had claimed, I should have gotten.' How far do these conventions and this act of parliament hit such a case?

"[The Lord Chancellor: I am of opinion that these conventions and this act of parliament do not prevent the court from having jurisdiction. And, on the question, whether, upon the whole of this record, the plaintiff has any title which a court of equity can enforce, I should propose to hear one counsel on each side.]

"The case was again argued, and the Lord Chancellor delivered judgment. 'After giving great consideration to this cause, I am of opinion that this bill must be dismissed. I continue to think that this court has jurisdiction to attach equities on the award of the commissioners in some cases; but I do not think that the claim of Devereaux and Reardon can be considered as a claim, in respect of which they can be deemed to be affected by equities (upon the state of this record) in favor of the plaintiffs.' The bill was dismissed without costs."

This case presents much stronger points in the plaintiffs' favor than the one before this court. Here, the claims are by heirs against an executor and residuary legatee. The compensation was made for confiscating property claimed by the heirs to have been the property of their ancestors. The executor is not charged with fraud, to be sure; nor is there any ground to charge Morton with fraud against the plaintiffs here. If Morton was not entitled to the piece of land deeded to him, his act

in obtaining it from the city can not be made to operate in favor of plaintiffs. Suppose the city should have thought proper to have contended with Morton for the land, on account of fraud alleged to have been practiced against her by Morton, in obtaining her title, and should have succeeded in cancelling and vacating the deed to Morton, was she still bound to convey to Rutgers' representatives the land at twenty dollars per acre, or at any price. Was there any equity in Rutgers' representatives against the city?

Upon a thorough and careful examination of the case presented to us, and after great consideration, this court is of the opinion that the plaintiffs have no right to the relief sought by their bill. There is nothing by which we can attach a trust to Morton in favor of Rutgers' representatives to affect the property in dispute. Morton must be considered as claiming entirely adverse to them. The lower court, therefore, should have dismissed the bill of the plaintiffs upon the final hearing. Its decree, in favor of the plaintiffs, is reversed, and the bill of plaintiffs is dismissed, with costs; the other judges concurring.